**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Aspect Systems, Inc., an Arizona corporation,<br><br>           Plaintiff,<br><br>vs.<br><br>Lam Research Corporation, et al., a Delaware corporation,<br><br>           Defendants. | No. CV 06-1620-PHX-NVW<br><br>**ORDER** |

Plaintiff Aspect Systems, Inc. ("Aspect") and Defendant Lam Research Corporation ("Lam") have each moved for summary judgment. (Doc. ## 65, 68.) For the following reasons, Aspect's motion is denied and Lam's motion is granted in part and denied in part.

**I. Background**

Aspect is in the business of refurbishing, remanufacturing, and supplying parts for legacy semiconductor etch tools. Lam manufactures new semiconductor etch tools. The dispute between these two parties revolves around two written agreements regarding Aspect's purchase of certain spare parts inventory and licensing of related intellectual property owned by Lam.

### A. Contracts Between the Parties

In November, 2002 Aspect and Lam entered into a written Asset Sale and License Agreement ("the 2002 agreement"). Lam agreed to "sell Aspect certain assets and provide certain licenses under Lam's patents, copyrights, trade secrets and know-how . . . that would be useful to Aspect in the manufacture, refurbishment, servicing and repair of AutoEtch® and Drytek® machines." (Doc. # 67-2, Ex. 3.) The assets that Aspect agreed to purchase were to be listed in Exhibit A to the agreement. However, the parties agree that no Exhibit A was attached to the agreement at the time that they signed it. (Doc. # 74 ¶ 7.) Within the agreement, Lam represented that "it has been using the Assets in the manufacture, service or repair of the AutoEtch and Drytek machines." (Doc. #67-2, Ex. 3 ¶ 3a.) Lam also agreed that in the future it would "purchase AutoEtch and DryTek parts and assemblies solely from Aspect Systems and solely for the support of Lam service contracts or service personnel." (*Id.* ¶ 7a.) The licensing portion of the agreement grants Aspect various rights to Lam's intellectual property, including to "Lam's trade secrets and know-how encompassed in Lam's specifications and drawings for parts identified in Exhibit A or utilized in the products identified in Exhibit A to make or have made components and assemblies for incorporation into the Licensed Products." (*Id.* ¶ 8a(iii).) The agreement contains an integration clause, requires any amendments to be in writing and signed by the parties, and specifies that California law governs the contract. (*Id.* ¶¶ 16, 18.)

After the parties had signed the agreement, in December of 2002 and throughout the first several months of 2003, Aspect's lead negotiator on the agreement, Paul Mazzulla, wrote a number of e-mails to Lam's lead negotiator, Paul Charrette, raising various complaints about Lam's performance under the agreement. Mr. Mazzulla complained that, inconsistent with Lam's representations during negotiation of the agreement, (1) Lam had not performed an "excess and obsolete" analysis on the parts inventory sold to Aspect; (2) the great majority of the parts that Lam sold to Aspect were obsolete and unusable; (3) Lam had removed valuable parts from the list of inventory to

1 be sold to Aspect after the agreement was signed; and (4) the agreed upon royalty
2 payment was based on inaccurate revenue figures.  (Doc. ## 67-2, Exs. 5, 7, 9; 67-5, Ex.
3 12.)  In October, 2003, Aspect's CEO, Dennis Key, directed that it would not make
4 further payments on the agreement until its complaints were addressed.  (Doc. # 67-2, Ex.
5 1 at 83:9–24.)  Mr. Key then had a meeting with Lam outlining its complaints.  (Doc. #
6 67-3, Ex. 15.)  Aspect had defaulted on the license agreement by November, 2003.  (Doc.
7 # 75-11, Ex. 16 at 22.)

8      On June 25, 2004, Aspect and Lam entered into an Agreement on Outstanding
9 Aspect Payables ("the 2004 agreement").  Paragraph 1 of the agreement is entitled
10 "Purpose" and states that the agreement's purpose "is to establish a plan for Aspect to pay
11 outstanding payables to Lam, which are to be generated from equipment refurbishment
12 sales and, if necessary, from spare part sales."  (Doc. # 67-2, Ex. 4 ¶ 1.)  The agreement
13 further states that "[w]ith regard to the payments owed by Aspect on the sale of
14 $1,874,605.12 inventory, this agreement is to be understood as an amendment to the
15 'Asset Sale and License Agreement', dated 11/08/2002, between the two parties."  (*Id.*)
16 In the agreement, Lam agreed, (1) to sell Aspect the remaining AutoEtch and DryTek
17 unique inventory in Lam's Spares inventory and give Aspect thirty-three repaired TCUs
18 and one defective TCU, (*id.* ¶ 3); (2) to reduce the receivable balance from the initial
19 inventory sale by $750,000 and to schedule payments on the balance through January,
20 2007, (*id.* ¶ 4); (3) to transfer to Aspect all test and assembly equipment unique to
21 AutoEtch and DryTek material then manufactured at Lam, to provide training on that
22 equipment, and to transfer all specification and test documentation to Aspect, (*id.* ¶ 6); (4)
23 to sell Aspect its remaining manufacturing inventory, (*id.* ¶ 7); and (5) to grant Aspect a
24 $250,000 line of credit, (*id.* ¶ 8).  According to the agreement, the reduction in the
25 receivables balance "reflects Aspect's current financial situation as well as their ability to
26 make future payments."  (*Id.* ¶ 4.)  The agreement explicitly stated, "Royalties remain due
27 as agreed upon in the 'Asset Sale and License Agreement'."  (*Id.* ¶ 9.)  In a paragraph
28 entitled "Future risks," the agreement stated, "The negotiated payment amounts and terms

- 3 -

are final.  By signing this agreement, Aspect will fully assume all risks associated with the transferred business and assets."  (*Id.* ¶ 10.)

### B. Aspect's Complaint

Aspect's First Amended Complaint alleges that Lam breached the 2002 and the 2004 agreements, and that Lam made a number of fraudulent misrepresentations in relation to those contracts.  Fairly read, the complaint alleges that Lam breached the 2002 agreement by, (1) removing parts from the list of inventory that Aspect had agreed to purchase and then continuing to market those parts for their own benefit despite their agreement to source the parts solely from Aspect; (2) selling Aspect obsolete parts despite having represented that the parts were currently in use and could be resold; and (3) refusing to provide specifications and drawings for the parts that Aspect had agreed to purchase as required by the licensing provisions in the agreement.  (Doc. # 14 ¶¶ 29–33, 37.)

Aspect's complaint alleges that Lam breached the 2004 agreement in four ways: (1) Lam breached paragraph 1 of the contract by making it impossible for Aspect to refurbish equipment and sell spare parts; (2) Lam breached paragraph 3 by failing to transfer the remaining AutoEtch and DryTek spares inventory and the TCUs; (3) Lam breached paragraph 6 by failing to transfer the test and assembly equipment and the specification and test documentation; and (4) Lam breached paragraph 7 by failing to transfer its remaining manufacturing inventory.  (*Id.* ¶¶ 34–36.)

Aspect's complaint also alleges fraud under the 2002 and 2004 agreements.  It alleges that, in connection with the 2002 agreement, Lam fraudulently misrepresented that, (1) it had performed an "excess and obsolete" analysis on the parts it was proposing to sell and that it was actively utilizing those parts in the manufacture, refurbishment, service or repair of AutoEtch or DryTek machines; (2) it would transfer all parts necessary for the business contemplated by the agreement to Aspect; and (3) the licensing royalty was based on Lam's past revenue generated from the parts transferred to Aspect.  (*Id.* ¶¶ 41–43.)  Respecting fraud under the 2004 agreement, Aspect alleges that "[i]t was

- 4 -

1 represented by Paul Charrette to Paul Mazzula in June of 2004 that Lam would shift
2 business to Aspect as part of the negotiations leading to the amendment to the agreement
3 and that Lam would abandon certain business in favor of Aspect. The intention was to
4 induce execution of the amendment and stop the immediate filing of a lawsuit." (*Id.* ¶
5 44.)

## II. Legal Standard for Summary Judgment

Rule 56(c), Fed. R. Civ. P., provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A "genuine issue" of material fact will be absent if, "viewing the evidence and inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter of law." *Jones v. Halekulani Hotel, Inc.*, 557 F.2d 1308, 1310 (9th Cir. 1977); *see also Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1111 (9th Cir. 2001). Any supporting facts presented by the parties must be admissible into evidence. Fed. R. Civ. P. 56(e). Conclusory and speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and to defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nature of this responsibility varies, however, depending on whether the movant or the non-movant would bear the burden of persuasion at trial with respect to the issue at hand. If, as here, the burden of persuasion at trial would be on the party moving for summary judgment, that party may satisfy its initial burden of production only by showing that it would be "entitle[d] . . . to a directed verdict if the evidence went uncontroverted at trial."

- 5 -

1  *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992); *cf. Berry v. Bunnell*, 39 F.3d
2  1056, 1057 (9th Cir. 1994) ("A directed verdict is proper when the evidence permits only
3  one reasonable conclusion.").

4  Where the moving party has met its initial burden with a properly supported
5  motion, the party opposing the motion "may not rest upon the mere allegations or denials
6  of his pleading, but . . . must set forth specific facts showing that there is a genuine issue
7  for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary
8  judgment is appropriate against a party who "fails to make a sufficient showing to
9  establish the existence of an element essential to that party's case, and on which that party
10 will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322; *Matsushita Elec.*
11 *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmovant's showing of
12 "some metaphysical doubt" as to material facts insufficient); *see also Citadel Holding*
13 *Corp. v. Roven*, 26 F.3d 960, 964 (9th Cir. 1994).  Summary judgment is not appropriate
14 when the nonmoving party identifies or produces evidence from which a reasonable juror,
15 drawing all inferences in favor of the nonmoving party, could return a verdict in the
16 nonmoving party's favor.  *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir.
17 1999).

18 **III. Viability of Aspect's Claims Under the 2002 Agreement**

19 Lam argues that Aspect may not proceed with its claims under the 2002 agreement
20 because, (1) by signing the 2004 agreement, Aspect waived its fraud claims and settled its
21 breach of contract claims under the 2002 agreement; (2) the statute of limitations bars its
22 fraud claims under the 2002 agreement because they were not timely asserted.

23 **A. Effect of the 2004 Agreement**

24 **1. Aspect Did Not Waive Its Fraud Claims**

25 Lam argues that Aspect waived its claims of fraudulent misrepresentation by
26 signing the 2004 agreement.  Its primary authority for this conclusion is *Oakland Raiders*
27 *v. Oakland-Alameda County Coliseum, Inc.*, 144 Cal. App. 4th 1175, 51 Cal. Rptr. 3d 144
28 (Ct. App. 2006).  The court in *Oakland Raiders* held,

- 6 -

> a plaintiff claiming to have been induced into signing a contract by fraud or deceit is deemed to have waived a claim of damages arising therefrom if, after discovery of the alleged fraud, he enters into a new contract with the defendant regarding the same subject matter that supersedes the former agreement and confers upon him significant benefits.

*Id.* at 1185, 51 Cal. Rptr. at 149–50. According to that holding, a plaintiff waives a fraud claim only if it enters into a new contract "after discovery of the alleged fraud." *Id.* One of the cases cited by the court, *Linda Coal & Supply Co. v. Tasa Coal Co.,* 416 Pa. 97, 100, 204 A.2d 451, 453 (1964), explains that for a plaintiff to have waived a fraud claim it must have "had at the time of the renegotiations full knowledge of all the material facts regarding the fraudulent statements which induced the original agreement, and, with this knowledge, to have entered into the new arrangement." *Oakland Raiders* also cites a treatise for the proposition that a person "may, by conduct inconsistent with an intention to sue for damages for the fraud, waive the right to sue." 144 Cal. App. 4th at 1190, 51 Cal. Rptr. 3d at 154 (quoting 37 Am. Jur. 2d *Fraud and Deceit* § 321 (2001)). That same treatise explains that "for one defrauded in a transaction to waive the right to sue for damages by conduct inconsistent with an intention to sue, the waiving party must be aware of the fraud and possess adequate knowledge of all of its material aspects." 37 Am. Jur. 2d *Fraud & Deceit* § 322 (2007).

For a representation to be fraudulent, it must not only be false, but also uttered with knowledge of its falsity and with an intent to defraud. *Magpali v. Farmers Group*, 48 Cal. App. 4th 471, 484, 55 Cal. Rptr. 2d 225, 233 (Ct. App. 1996). Lam relies on evidence showing Aspect's awareness of the alleged falseness of certain representations made during negotiations for the 2002 agreement. For example, Lam points to the affidavits of Wayne Bixler and Doug Dixon, wherein they testify that when the shipping boxes were opened they were shocked to observe that most of the parts were "junk." (Doc. ## 69-6, Ex. 3 ¶ 9; 69-10, Ex. 7 ¶ 7.) Lam also points to the e-mails sent by Mr. Mazzulla in late 2002 and early 2003. Those e-mails evidence his belief that Lam had not performed an "excess and obsolete" analysis on the inventory, that the majority of the parts delivered were in fact obsolete, that valuable parts had been removed from the list of

1  inventory, and that the agreed upon royalty payment was based on inaccurate revenue
2  figures. All this evidence undisputedly shows that Mr. Bixler, Mr. Dixon, and Mr.
3  Mazzulla believed that certain of Lam's representations during contract negotiations were
4  false. However, it does not show that those officers knew that Lam's negotiator had
5  made the misrepresentations knowing them to be false and with the intent to defraud
6  Aspect. *See Linda Coal & Supply Co.,* 416 Pa. at 100, 204 A.2d at 454 ("[T]he court
7  below fell into error in equating knowledge of the falsity of the representations with
8  knowledge of their fraudulent character."). Aspect did not waive its fraud claims because
9  there is no evidence that it had actual knowledge of the fraud when it signed the 2004
10 agreement.

## 2. The 2004 Agreement is Not an Accord

12 Lam also argues that Aspect cannot sue for breach of the 2002 agreement because
13 the 2004 agreement resolved its breach of contract claims. The court initially notes that
14 Lam has not cited any legal authority addressing how to construe the effect of the 2004
15 agreement on the 2002 agreement as a matter of California contract law. That is reason
16 enough to deny their motion on that issue. However, Lam pleaded the affirmative
17 defense of accord and satisfaction in its answer to the First Amended Complaint, so that
18 defense will be considered.

> For the affirmative defense of accord and satisfaction to apply in disposition of an unliquidated claim, the defendant must establish: (1) that there was a "bona fide dispute" between the parties, (2) that the debtor made it clear that acceptance of what he tendered was subject to the condition that it was to be in full satisfaction of the creditor's unliquidated claim, and (3) that the creditor clearly understood when accepting what was tendered that the debtor intended such remittance to constitute payment in full of the particular claim in issue.

23 *Thompson v. Williams*, 211 Cal. App. 3d 566, 571, 259 Cal. Rptr. 518, 521 (Ct. App.
24 1989). "Determining the parties' intent is a highly fact-specific inquiry. Such inquiries
25 are not generally suitable for disposition on summary judgment." *Fanucchi & Limi*
26 *Farms v. United Agri Products*, 414 F.3d 1075, 1082 (9th Cir. 2005) (construing
27 California contract law on novations and accords).

- 8 -

1     The 2004 agreement gives no indication that the parties intended it to be a
2 compromise or settlement of a disputed claim for breach of contract.  The document's
3 title is "Agreement on Outstanding Aspect Payables" and it states that its purpose is to
4 "establish a plan for Aspect to pay outstanding payables."  More specifically, the
5 agreement states that the reduction in the receivables balance "reflects Aspect's current
6 financial situation as well as their ability to make future payments" and "is to be
7 understood as an amendment" to the 2002 agreement.  The agreement speaks only of
8 Aspect assuming "[f]uture risks" associated with the business and inventory, not releasing
9 past claims.  (Doc. # 67-2, Ex. 4 ¶¶ 1, 4, 10.)  The agreement on its face establishes a
10 means for Aspect to repay its debt to Lam; it says nothing regarding Lam's potential
11 liability to Aspect for breach of the 2002 agreement.

12     Lam argues that the context and circumstances surrounding the 2004 agreement
13 demonstrate the parties' intent to finally settle Aspect's claims for breach of the 2002
14 agreement.  Although it is true that "whether an agreement amounts to an accord depends
15 upon [the parties'] mutual intention, as shown by the terms of the agreement viewed in
16 the light of the surrounding facts," it is also true that "the circumstances must be of such
17 character as to express in a clear manner an intention to be affected, or an accord is not
18 shown."  *S. Cal. Disinfecting Co. v. Lomkin*, 183 Cal. App. 2d 431, 442, 7 Cal. Rptr. 43,
19 50 (Ct. App. 1960).  All the record shows is that in October of 2003 Aspect approached
20 Lam with its complaints regarding the 2002 agreement, and that many months later, in
21 June of 2004, the parties entered into the Agreement on Outstanding Aspect Payables.
22 Lam does not point to any contemporaneous statements that show that it informed Aspect,
23 or that Aspect understood, that the benefits Lam was conferring in the 2004 agreement
24 were in full satisfaction of all of Aspect's claims, known or unknown.

25     Lam does point to the November 9, 2007 deposition of Mr. Mazzulla, Aspect's
26 chief negotiator.  There it was explained to Mr. Mazzulla that a previous draft of the 2004
27 agreement had included a paragraph stating,

28

> To settle the dispute on receivables from inventory buyback, both parties will make their best effort to agree on the marketable amount of inventory. Inventory was initially sold to Aspect at a 25 percent discount against acquisition cost, assuming that about 25 percent of the inventory was stale/excess. Both parties will reassess this percentage and come to an agreement on outstanding receivables. Lam will either issue a credit or take back stale inventory above the currently agreed 25 percent rate, once both parties have reached agreement.

That paragraph was not included in the final agreement. Mr. Mazzulla was then asked, "Was the $750,000 credit the result of the set of actions that are outlined [in the excised paragraph on settlement]?" Mr. Mazzulla responded, "Yes." (Doc. 67-2 at 132–33.)

A reasonable fact finder could conclude from this testimony that Mr. Mazzulla admitted only that the $750,000 credit reflected the parties' reassessment of the amount of stale inventory that Aspect sold to Lam. He did not admit that the 2004 agreement finally settled all of Aspect's claims for breach of the 2002 agreement. In fact, quite the opposite could be inferred from the excision of the paragraph from the final agreement, which stated that the credit was only meant to reflect Aspect's "current financial situation as well as their ability to make future payments." (Doc. # 67-2, Ex. 4 ¶ 4.) Furthermore, if the parties intended the $750,000 credit to compensate for the transfer of stale inventory, then perhaps they did not intend it to address the revenue that Lam was generating by retaining for itself and selling parts that it had allegedly already sold to Aspect under the 2002 agreement. Aspect claims to have learned about those revenue figures for the first time in response to its interrogatories. (Doc. # 78-5, Ex. 4 at 2–3.) The court cannot conclude as a matter of law that the parties intended the 2004 agreement to finally settle all of Aspect's claims for breach of the 2002 agreement.

**B. Statute of Limitations for Fraud**

Lam argues that Aspect's claim of fraudulent misrepresentation under the 2002 agreement is barred by the statute of limitations. The statute of limitations for fraud claims is three years. Cal. Code Civ. Proc. § 338(d); A.R.S. § 12-543(3).[1] According to

---

[1] The parties have not argued whether California or Arizona law should apply to the statute of limitations issue. The parties cited cases from both jurisdictions, contending that

- 10 -

1 the California statute, the limitations period does not begin to run "until the discovery, by
2 the aggrieved party, of the facts constituting the fraud." § 338(d). "The discovery rule
3 only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of
4 action." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807, 110 P.3d 914, 920
5 (2005); *see also Clemens v. DaimlerChrysler Corp.*, __ F.3d __, 2008 U.S. App. LEXIS
6 12929 at *11, 2008 WL 2446317 at *4 (9th Cir. 2008) ("[T]he start of the limitations
7 period is postponed only if [the plaintiff] has made an affirmative showing that he lacked
8 inquiry notice and subsequently gained such notice less than three years before filing his
9 action."). "A plaintiff has reason to discover a cause of action when he or she 'has reason
10 at least to suspect a factual basis for its elements.'" *Fox*, 35 Cal. 4th at 807, 110 P.3d at
11 919 (quoting *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 398 (1999)).

12 Aspect filed its original complaint on June 6, 2006. Therefore, Aspect's fraud
13 claims under the 2002 agreement are time-barred if it had reason to suspect, by June of
14 2003, the fraudulent character of Lam's statements. Aspect alleges that Lam committed
15 three distinct acts of fraud. First, it alleges that Lam fraudulently misrepresented that it
16 had performed an "excess and obsolete" analysis on its parts inventory and that it was
17 proposing to sell current, active parts. To show that Aspect had inquiry notice of this
18 alleged fraud in June of 2003, Lam relies on the e-mails sent by Mr. Mazzulla and the
19 affidavits of Mr. Bixler and Mr. Dixon. That evidence shows that Aspect had inquiry
20 notice of the alleged fraud. It was essential to the profitability of the deal that Aspect
21 receive a substantial amount of current, active parts that could be resold to create cash
22 flow. Yet, according to Aspect, the quality of the parts actually received was
23 extraordinarily worse than Lam had represented. In particular, Mr. Mazzulla's e-mail of
24 February 12, 2003 stated,

25 > [I]t has been determined that LRC's statement than an E & O analysis was
> performed on this material on a quarterly basis and any material that did not
26 > move within a 24 month period was discarded and written off, was not

27 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
28 the law in California and Arizona is the same. The court therefore proceeds on that basis.

- 11 -

> [a]ccurate. It is likely that out of the 3 million in inventory sold to ASI, there was less than [a] million of usable material.

(Doc. # 67-2, Ex. 7.) Mr. Bixler also testified that he was "shocked to find that the parts and equipment contained therein were mostly junk." (Doc. #69-6, Ex. 3 ¶ 9.) Given the importance of the quality of the parts, any reasonable business person who received $2 million worth of junk parts, which constituted about two-thirds of the total inventory, would suspect fraud.

Second, Aspect alleges that Lam fraudulently misrepresented that it would transfer to Aspect all parts necessary for the business contemplated by the agreement. Again, the evidence shows that Aspect had inquiry notice of this particular fraud by June of 2003. In December of 2002, Mr. Mazzulla wrote to Mr. Charrette,

> In late July of this year [the parts] list was issued to me with your approval and was marked as the 'final list'. However and unfortunately, once again and in the final hour, parts have been taken off the list and the revenue numbers have gone down once more. Paul, I cannot believe it is your intention to make Aspect fail in regards to this program . . . .

(Doc. # 76-2, Ex. 5.) This letter evidences that Lam's unilateral changes to the parts list had profound consequences for the profitability of the deal to Aspect. The fact that those changes were made after the parties had allegedly agreed on a final parts list and signed the contract would put a reasonable business person on inquiry notice of fraud. Moreover, the letter evidences that Mr. Mazzulla in fact had begun to suspect that Lam was not acting in good faith. In addition to explicitly questioning Lam's intention to make Aspect fail, he stated that Lam "for reasons right or wrong re-coded parts and paired down the list." (*Id.*)

Third, Aspect alleges that Lam fraudulently misrepresented that the licensing royalty was based on Lam's past revenue generated from the parts transferred to Aspect. Aspect had agreed to pay Lam a monthly royalty based upon the revenue it would receive by selling the spare parts and refurbishing machines. In the same e-mail where Mr. Mazzulla expressed doubts about Mr. Charrette's intentions, Mr. Mazzulla stated that due to Lam's actions, "[t]he revenue figures that were previously given to Aspect, and that

- 12 -

Aspect used to determine what costs, inventory and royalty payments made good business sense, had changed." (*Id.*). Later, in March of 2003, Mr. Mazzulla wrote to Mr. Charrette,

> Obviously the annual totals are nowhere near the 4.5 million we based the royalty on . . . . It does not take a genius to figure out that if you make 250K monthly even at 55% average gross margins you only have 140K in profits. Subtract 56K in royalties and 120K in inventory payments and we are running in the red . . . . The only fair thing to do is adjust the payments so they make sense . . . .

(Doc. # 67-2, Ex. 9.) Mr. Mazzulla's realization that Aspect's revenue from the deal was "nowhere near" the agreed upon figure should have caused Aspect to suspect fraud, and the December, 2002 e-mail demonstrates that Mr. Mazzulla did suspect fraud. Aspect was on notice to inquire further into the basis for the revenue projection and why it was unable to achieve the agreed upon figure.

On the facts available in June of 2003 Aspect had reason to at least suspect a factual basis for each of its fraud claims against Lam. Accordingly, Aspect's claims for fraud under the 2002 agreement are barred by the statute of limitations, and Lam is entitled to partial summary judgment in its favor on that issue.

**IV. Sufficiency of the Evidence to Support Summary Judgment**

Having concluded that Aspect may proceed with its breach of contract claims under the 2002 agreement, as well as its claims under the 2004 agreement, the sufficiency of the evidence in light of the pleadings and other papers must now be considered. The court notes at the outset that Aspect's memorandum in support of its motion for summary judgment inappropriately failed to cite a single legal authority in support of its position.

**A. Claims Arising Under the 2002 Agreement**

Neither Aspect nor Lam has proved the absence of a genuine issue of material fact regarding the alleged breaches under the 2002 agreement. In the agreement, Lam represented that "it has been using the Assets in the manufacture, service or repair of the AutoEtch and Drytek machines." (Doc. # 67-2, Ex. 3 ¶ 3a.) That constitutes a warranty that the parts were not obsolete, but rather that they were substantially current, active

- 13 -

1 parts that could be resold. Furthermore, Lam agreed to sell Aspect a "license under
2 Lam's trade secrets and know-how encompassed in Lam's specifications and drawings"
3 for the parts that Aspect was purchasing. (*Id.* ¶ 8iii.) Lam therefore agreed to provide
4 Aspect with the specifications and drawings for the parts that it was purchasing.
5 However, the evidence reveals genuine disputes over specifically which parts Aspect was
6 purchasing, the quality of the parts delivered to Aspect, whether the parts that Lam
7 retained and later sold to other customers were subject to the agreement, and whether
8 Lam fulfilled its obligation to provide supporting specifications and drawings. The
9 motion for summary judgment on the breach of contract claims under the 2002 agreement
10 is therefore denied. Although Aspect's fraud claims are barred by the statute of
11 limitations, much of the evidence that Aspect cited to prove fraud may also be relevant to
12 and admissible on the surviving breach of contract claims. Such evidence may include
13 the Lam internal e-mails that suggest their plan to "print[] money for those parts currently
14 considered excess" by selling inventory they "had dispositioned for scrap" to Aspect, but
15 hold back more valuable parts because "we don't want Aspect to compete with us in this
16 market." (Doc. ## 69, Exs. 11, 12, 13, 14, 15, 17, 20, 25; 82, Ex. F.)

**B. Claims Arising Under the 2004 Agreement**

**1. Breach of Contract Claims**

19 Aspect's complaint alleges that Lam breached paragraphs 1, 3, 6, and 7 of the
20 2004 agreement. The only alleged breach of the 2004 agreement that must be resolved at
21 trial is that of paragraph 6, which required Lam to transfer to Aspect test and assembly
22 equipment, specifications and test documentation. Lam admits that there remains a
23 disputed issue of material fact as to breach of that obligation. Lam has shown the absence
24 of a genuine issue of material fact as to the alleged breaches of paragraphs 1, 3, and 7.

25 Paragraph 1 of the 2004 agreement is entitled "Purpose" and recites that the
26 purpose of the agreement "is to establish a plan for Aspect to pay outstanding receivables
27 to Lam." (Doc. # 67-2, Ex. 4 ¶ 1.) Aspect argues that Lam breached paragraph 1 by
28 "intentionally acting in a manner which made it impossible for Aspect to generate funds

- 14 -

1  to pay receivables from equipment refurbishment and from sale of spare parts." (Doc. #
2  14 ¶ 34.) Lam responds that paragraph 1 is merely a recital clause that created no binding
3  legal obligation. "Recitals or preambles prefixed to an agreement may or may not have
4  binding force." *Hunt v. United Bank & Trust Co.*, 210 Cal. 108, 115, 291 P. 184, 187
5  (1930). A recital creates a binding legal obligation only if it was designed and intended
6  to "form part of the operative covenants of the instrument." *Id.*; *see also Emeryville*
7  *Redevelopment Agency v. Harcros Pigments*, 101 Cal. App. 4th 1083, 1101 & n.6, 125
8  Cal. Rptr. 2d 12, 25 & n.6 (Ct. App. 2002) (collecting authorities in support of the
9  proposition that "[r]ecitals are given limited effect even as between the parties").

10  The recital in paragraph 1 of the 2004 agreement states the objective of the
11  agreement, which the parties agreed to effectuate through the specific obligations listed in
12  paragraphs 3 through 10. Paragraph 1 can be used to interpret the obligations delineated
13  elsewhere in the agreement, but Aspect cannot transform paragraph 1 into a covenant not
14  to compete or use it to hold Lam liable for any act or failure to act that arguably made
15  business more difficult for Aspect. Lam's legal obligations to Aspect are laid out in the
16  agreement's other paragraphs. Lam is therefore granted partial summary judgment that
17  paragraph 1 does not contain, and Lam did not breach, any binding legal obligation
18  separate from the other enumerated paragraphs.

19  Respecting paragraphs 3 and 7 of the 2004 agreement, Lam has identified portions
20  of the record that show that it fulfilled its obligations. (Doc. # 67-2, Ex. 2 at
21  148:21–148:9, 150:4–151:24). Aspect has not supplied or identified controverting
22  evidence in the record. Lam is therefore granted partial summary judgment that it did not
23  breach its obligations under paragraphs 3 and 7 of the 2004 agreement.

24  Aspect has also argued in its briefs that during negotiations for the 2004 contract
25  Lam promised that it would sell Aspect Rainbow and TCP parts at a 10% discount and
26  would renegotiate the royalty payment for the licensing agreement. However, Aspect did
27  not allege the existence or breach of any oral agreements relating to the 2004 agreement
28  in its complaint. The complaint alleges only that Lam breached several specific

1 paragraphs of the written 2004 agreement, and that Lam conducted a "campaign to keep
2 business from Aspect" and "favor its own competitive business." (Doc. # 14 ¶¶ 34–37).
3 Having not pleaded the existence or breach of oral agreements related to the 2004
4 agreement, Aspect may not now, after the close of discovery, raise such alleged oral
5 agreements as a basis of liability. *Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 113 (5th
6 Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in
7 response to a motion for summary judgment is not properly before the court."); *Gilmour
8 v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (same); *Shanahan v.
9 City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) (same).

### 2. Fraud Claims

Aspect alleges that in June of 2004 Mr. Charrette fraudulently misrepresented to Mr. Mazzulla that it would "shift business to" and "abandon certain business in favor of Aspect as part of the negotiations leading to the amendment to the agreement." (Doc. # 14 ¶ 44.) The alleged purpose of the misrepresentation "was to induce execution of the amendment and stop the immediate filing of a lawsuit." (*Id.*)

"Actionable deceit exists where a promise is made 'without any intention of performing it.'" *Bldg. Permit Consultants, Inc. v. Mazur*, 122 Cal. App. 4th 1400, 1414, 19 Cal. Rptr. 3d 562, 572 (Ct. App. 2004) (citing Cal. Civ. Code, § 1710, subd. (4)). To prevail on such a claim, Aspect must of course first prove that Lam made a specific and definite promise to give it business. *See Blake v. Paramount Pictures, Inc.*, 22 F. Supp. 249, 252 (S.D. Cal. 1938) ("To be fraudulent as having been made without intention to perform, a promise must be specific, definite."); *Staheli v. Kauffman*, 122 Ariz. 380, 383–84, 595 P.2d 172, 175–76 (1979) (holding that a promise that "we would work out a limited partnership" was not "sufficiently definitive" to support a fraud claim).

A thorough review of the record shows that Aspect has failed to produce sufficient evidence to support a jury finding that, in June of 2004, Mr. Charrette made any specific or definite promise to give Aspect business to induce it to sign the 2004 agreement. Mr. Mazzulla testified that, before the parties signed the 2002 agreement, he was aware that

- 16 -

1  Lam was removing certain parts from the list of inventory.  When he raised the issue with
2  Mr. Charrette he was told "they would give us repair business, other business that would
3  help us make up for the drop in the parts business, from them pulling the parts off of it."
4  (Doc. # 69-3, Ex. 2 at 43; *see also id.* at 46, 107.)  According to Mr. Mazzulla, Mr.
5  Charrette made such reassurances in the months before and after the parties signed the
6  2002 agreement.  (*Id.* at 80–81.)

7  After raising problems about the 2002 agreement, Mr. Mazzulla sent an e-mail to
8  Mr. Charrette in February of 2003 to confirm that they had discussed, as a "possible"
9  solution to the issues, that "Paul Charrette will steer Lam refurb business . . . to ASI,
10  ASAP."  (Doc. # 69-27, Ex. 24.)  The following month, Mr. Mazzulla sent an e-mail to
11  several Aspect employees stating that Lam had "offered the following solutions" to the
12  dispute, which included, (1) Lam would "do everything possible . . . to have ASI become
13  the supplier of the two RF matches"; (2) Lam would "give" Aspect the "DryTek Quad
14  business"; (3) Lam would "move quickly to have ASI become their remanufacturer of
15  Lam 2080 chillers"; and (4) Lam would "identify the next two parts from the refurb
16  center for ASI to become sole source supplier."  (Doc. # 78-12, Ex. 11.)  In September of
17  2003, one month before formally meeting with Lam, Mr. Key followed up on this e-mail
18  stating, "Unless I have missed something, none of these things have happened."  (Doc. #
19  69-32, Ex. 29.)

20  On June 7, 2004, shortly before the parties signed the 2004 agreement, Mr. Levi-
21  Lev-Ary sent an e-mail on behalf of Lam to Mr. Key where he stated, "please review
22  these proposed next steps and understandings that may be used as the basis for our work
23  together, should we agree to pursue this possibility."  One of those proposed next steps
24  was as follows, "To enable response to demand for immediate and near te[r]m deals, Lam
25  will shift some [refurbishment business], at Lam['s] decision, to ASI."  (Doc. # 67-3, Ex.
26  16.)  A few days later, Mr. Levi-Lev-Ary sent another e-mail to Mr. Key offering
27  refurbishment business to Aspect.  (Doc. # 67-3, Ex. 17.)
28

- 17 -

1    The evidence does not support Aspect's contention that, in June of 2004, Mr.
2 Charrette made a promise to Mr. Mazzulla to give Aspect refurbishment business to
3 induce Aspect to sign the 2004 agreement. Rather, in the light most favorable to Aspect,
4 the evidence shows that Mr. Charrette's representations were made in late 2002 and early
5 2003, well before negotiations for the 2004 agreement had begun. Furthermore, Mr.
6 Charrette's representations were highly contingent. Giving business to Lam was at first
7 only a "possible" solution, (doc. # 69-27, Ex. 24), and then later became an "offer" to "do
8 everything possible," "move quickly," and "identify" business to give to Aspect, (doc. #
9 78-12, Ex. 11.) The only offer Mr. Mazzulla described in firm language was Mr.
10 Charrette's purported offer to "give" Aspect the DryTek Quad business; but again, that
11 was in March of 2003, more than one year prior to the 2004 agreement and seven months
12 before Mr. Key approached Lam formally. Mr. Mazzulla admitted at his deposition that
13 the discussion of shifting business to Aspect was ongoing, but "wasn't part of this [the
14 2004] agreement," and Lam only "said they would, you know, give us – try to give us
15 refurb business." (Doc. # 67-2, Ex. 2 at 169:11–21.) At best, the evidence is that in 2002
16 and 2003 Mr. Charrette made tentative offers to Mr. Mazzulla to try to give Aspect
17 business. Accordingly, Aspect's claim fails because Mr. Charrette's representations
18 were, (1) not made in June of 2004 to induce Aspect to refrain from filing suit and sign
19 the 2004 agreement; and (2) the alleged promises were not sufficiently specific and
20 definitive to form the basis of a fraud action.

21    There is evidence that one Lam employee proposed to give Aspect business in
22 June of 2004. That employee was Mr. Levi-Lev-Ary, not Mr. Charrette. Mr. Levi-Lev-
23 Ary made his proposal to Mr. Key, not Mr. Mazzulla. Nevertheless, Aspect's claim fails
24 even assuming that its complaint meant to plead fraud based on Mr. Levi-Lev-Ary's
25 representations. His statement about giving Aspect business was highly qualified; it was
26 a "proposed next step" that would only become firm "should [Aspect and Lam] agree to
27 pursue this possibility" and even then business would only be transferred "at Lam['s]
28 decision." (Doc. # 67-3, Ex. 16.) Given these qualifications, Mr. Levi-Lev-Ary did not

1 make a specific and definite promise that Lam would shift business to Aspect to induce it
2 to sign the 2004 agreement. There is also evidence that Mr. Levi-Lev-Ary did in fact
3 offer refurbishment business to Aspect after making his proposal. (Doc. # 67-3, Ex. 17.)
4 Aspect has therefore failed to prove that he did not intend to perform the alleged promise
5 at the time that he made it. For all of the reasons discussed, summary judgment in favor
6 of Lam is appropriate on this issue.

**VI.  Conclusion**

The evidence submitted in this case is extensive. Relying on oral promises and agreements allegedly contained in this evidence, Aspect has at times argued theories of breach and fraud not fairly alleged in its First Amended Complaint. The only causes of action upon which Aspect may proceed to trial are those specifically outlined in Section I.B of this order and upon which the court has not granted summary judgment in favor of Lam. Namely, Aspect may proceed on, (1) the enumerated breach of contract theories under the 2002 agreement; and (2) the enumerated breach of paragraph 7 of the 2004 agreement. Arguments going beyond these theories of liability will not be entertained.

IT IS THEREFORE ORDERED that Plaintiff Aspect Systems Inc.'s Motion for Summary Judgment, (doc. # 68), is denied.

IT IS FURTHER ORDERED that Defendant Lam Research Corporation's Motion for Partial Summary Judgment, (doc. # 65), is granted with respect to (1) the alleged acts of fraud under the 2002 agreement; (2) the alleged breaches of paragraphs 1, 3, and 7 of the 2004 Agreement on Outstanding Aspect Payables; and (3) Aspect's allegation that, in June of 2004, Mr. Charrette fraudulently misrepresented to Mr. Mazulla that Lam would shift business to Aspect. The motion is denied in all other respects.

/ / /

1   IT IS FURTHER ORDERED that Plaintiff Aspect Systems Inc. may only proceed
2 on those causes of action fairly alleged in its First Amended Complaint, as outlined in
3 Section I.B of this order, and upon which Lam has not been granted summary judgment in
4 its favor.

5   DATED this 26th day of June, 2008.

_____
Neil V. Wake
United States District Judge