**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Aspect Systems, Inc., an Arizona corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>Lam Research Corporation, et al., a Delaware corporation,<br><br>    Defendants. | No. CV 06-1620-PHX-NVW<br><br>**ORDER** |

This case arises out of the failed business relationship between Plaintiff Aspect Systems, Inc. ("Aspect") and Defendant Lam Research Corporation ("Lam"). Lam has renewed its motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) (doc. #218) and has moved for a new trial pursuant to Fed. R. Civ. P. 59(e) (doc # 219). It has also moved to amend the clerk's judgment (doc. # 212) and for approval of its bond on appeal (doc. # 239). Aspect moves for its attorneys fees under A.R.S. § 12-341.01. (Doc. # 217.)

**I. Procedural History**

The Court previously summarized the background of the dispute in its order on the parties' cross-motions for summary judgment. *See Aspect Sys., Inc. v. Lam Research Corp.*, No. CV 06-1620-PHX-NVW, 2006 U.S. Dist. LEXIS 67389, 2008 WL 2705154 (D. Ariz. Sept. 19, 2006). The Court granted Lam's motion for summary judgment in part, but concluded that Aspect could proceed to trial on its allegations that Lam breached

1  the 2002 contract by

> (1) removing parts from the list of inventory that Aspect had agreed to purchase and then continuing to market those parts for their own benefit despite their agreement to source the parts solely from Aspect; (2) selling Aspect obsolete parts despite having represented that the parts were currently in use and could be resold; and (3) refusing to provide specifications and drawings for the parts that Aspect had agreed to purchase as required by the licensing provisions in the agreement.

The Court further concluded that Aspect could proceed to trial on its allegation that Lam breached the 2004 contract by failing to transfer the test and assembly equipment and the specification and test documentation specified in paragraph 6 of the contract.

Thereafter, Lam moved in limine to preclude Aspect from offering any computation of its damages at trial because it had not disclosed any computation pursuant to Fed. R. Civ. P. 26(a)(1)(A). The Court denied Lam's motion because Aspect had disclosed its lost profits damages calculation in a mediation memorandum and the evidentiary material underlying that calculation was available to Lam. Furthermore, Lam had not challenged the validity of Aspect's lost profits calculation in its motion for summary judgment and it was improper to do so for the first time in a motion in limine. Lam also moved to prevent Aspect from offering undisclosed expert opinion testimony at trial. The Court denied that motion because Aspect did not plan to call any experts. (Doc. # 126.)

Lam moved for judgment as a matter of law at the close of Aspect's case. The Court granted Lam's motion only on its argument that the 2004 agreement resolved the amount Aspect owed to Lam for the physical inventory that Lam actually delivered to Aspect and that Aspect never returned. It denied the remainder of the motion subject to renewal at the close of all the evidence. (Trial Tr. at 896–919.) Lam again moved for judgment as a matter of law at the close of the evidence and the Court reserved the motion. The jury returned a verdict in favor of Aspect in the amount of $4,526,500.00. Final judgment against Lam was entered on January 7, 2009. Lam renewed its motion for judgment as a matter of law and moved for a new trial on January 15, 2009.

**II. Renewed Motion for Judgment as a Matter of Law**

Pursuant to Fed. R. Civ. P. 50(b), if a party moves for judgment as a matter of law at the close of evidence and the Court denies the motion, the moving party may "renew" its motion within ten days of the entry of final judgment. "A party cannot raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion." *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003). The moving party is limited to the "specific grounds" raised in the pre-verdict motion. *Wallace v. City of San Diego*, 479 F.3d 616, 620 (9th Cir. 2007) (citing *Lifshitz v. Walter Drake & Sons, Inc.*, 806 F.2d 1426, 1429 (9th Cir. 1986)). Furthermore, the Court will only address those arguments that Lam has specifically renewed in its post-trial motion, or that the Court reserved for later ruling.

"A district court may set aside a jury verdict and grant judgment as a matter of law 'only if, under the governing law, there can be but one reasonable conclusion as to the verdict.'" *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 510 (9th Cir. 2004) (quoting *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001)). When evaluating such a motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). It "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151.

**A. Lam's Liability for Breach of Contract**

With respect to Aspect's proof of liability, Lam's primary argument is that Aspect failed to prove the contents of Exhibit A to the 2002 agreement. According to Lam, all of its obligations under the 2002 agreement were limited to the contents of Exhibit A. The exhibit defined the physical inventory that Aspect was to receive, the trade secrets, know-how, specifications, and documentation that Aspect was to receive, and the parts that Lam would source exclusively from Aspect in the future. Since no Exhibit A was attached to the agreement and Aspect had not proved its contents, Aspect could not prove a breach of

1  the contract. It could not prove that any parts were removed from the list; it could not
2  prove that the parts on the list were obsolete; and it could not prove that any
3  specifications or documentation were missing. Lam persists in advancing this cramped
4  interpretation of the 2002 agreement in its renewed motion for judgment as a matter of
5  law.

6  Although the asset portion of the deal required Lam to sell its physical inventory
7  only of parts "defined in Exhibit A," (trial ex. 20 ¶ 1), other provisions of the contract
8  were not so limited. In the preamble of the agreement, Lam agreed "to sell Aspect certain
9  assets and provide certain licenses . . . that would be useful to Aspect in the manufacture,
10 refurbishment, servicing and repair of AutoEtch and Drytek machines ('the Licensed
11 Products')." (*Id.*)  The licensing provisions of the agreement granted Aspect the rights to
12 trade secrets and know-how not only for the "parts identified in Exhibit A," but also for
13 parts "utilized in the products identified in Exhibit A to make or have made components
14 and assemblies for incorporation into the Licensed Products [AutoEtch and DryTek
15 machines]." (*Id.* ¶ 8(a)(iii).) Lam agreed that Aspect would be its sole supplier not only
16 for parts listed in Exhibit A, but rather more broadly for "AutoEtch and DryTek parts and
17 assemblies." (*Id.* ¶ 7(a).)

18 Taken altogether, these provisions of the contract support Aspect's interpretation
19 that it was acquiring all of Lam's refurbishment and repair business for the AutoEtch and
20 DryTek tools. Under this interpretation, the licensing provisions of the agreement
21 required Lam to provide Aspect with specifications, documentation, trade secrets, and
22 know-how for all parts that Aspect would need to manufacture, refurbish, service, and
23 repair AutoEtch and DryTek machines, regardless of which parts were subject to the asset
24 sale. This interpretation finds support in the size of the royalty that Aspect agreed to pay
25 Lam. It is further supported by the testimonial and documentary evidence of the
26 negotiating history of the agreement, which clearly shows that both parties expected
27 Aspect to take over all of Lam's AutoEtch and DryTek business.
28

1     Lam's obligations under the 2002 agreement were therefore not necessarily limited
2 to the specific parts listed on Exhibit A.  Lam could have breached the agreement by
3 withholding information on parts necessary for Aspect to support the AutoEtch and
4 DryTek lines.  Aspect's lead negotiator, Mr. Mazzulla, testified that Aspect was unable to
5 support the DryTek tool and some versions of the AutoEtch tool because Lam never
6 provided requested documentation.  A Lam employee, Mr. Theess, admitted that by
7 refusing to grant Aspect access to "common parts" — a term that does not appear in the
8 contract — Lam made it impossible for Aspect to fully support AutoEtch and DryTek
9 machines.  (Trial Tr. at 832:7–11.)  This theory of breach is adequately encompassed in
10 the claims that survived summary judgment and therefore could serve as the basis for
11 Lam's liability.

12     There was also ample documentary and testimonial evidence that Lam unilaterally
13 removed parts from the list that was to become Exhibit A after the agreement had been
14 signed.  According to Lam, the parts removed were "common parts" that had been
15 miscoded as AutoEtch and DryTek parts.  Aspect's negotiator, Mr. Mazzulla, testified
16 that at no time did Lam communicate that the parts being removed from the list were
17 necessary for Aspect to manufacture, refurbish, service, and repair AutoEtch and DryTek
18 machines.  (Trial Tr. at 474–482.)  Moreover, the jury had powerful evidence that in the
19 parties' final understanding Exhibit A was supposed to include all parts necessary to
20 support the AutoEtch and DryTek lines, regardless of what physical inventory Lam was
21 going to transfer to Aspect.  As originally drafted, the contract specified that Exhibit B2
22 would list the parts for which Aspect would receive licenses.  Mr. Mazzulla allowed Lam
23 to delete all references to Exhibit B2 and replace them with references to Exhibit A, with
24 the understanding that the parts that Aspect would need to support the AutoEtch and
25 DryTek lines would be "all inclusive" of Exhibit A.  (Trial Ex. 15.)  Removing parts that
26 Aspect needed to support those lines after both parties signed the agreement with this
27 understanding was a breach fairly encompassed by the claims remaining for trial.
28

There was also ample evidence that the vast majority of parts delivered to Aspect were obsolete, even though Lam had warranted that it "has been using the Assets in the manufacture, service or repair of the AutoEtch and DryTek machines." As the Court observed in its order on summary judgment, that language constitutes a warranty that the parts were not obsolete and that they were substantially current, active parts that could be resold. The jury therefore had evidence to conclude that Lam breached the 2002 agreement by providing primarily obsolete parts, which is one of the outlined breaches that survived summary judgment for trial.

Lam of course presented evidence to supports its own contrary interpretation of the agreement, but the Court does not weigh the evidence on a motion for judgment as a matter of law. The plain language of the 2002 agreement does not preclude Aspect's interpretation. It simply does not clearly define the nature of Exhibit A and its relationship to the licensing provisions and the sole source provision. Therefore, it was necessary to permit the use of extrinsic evidence at trial to help clarify the intentions of the parties at the time the contract was signed and properly interpret the written language of the agreement. The jury was entitled to believe Aspect's version of the agreement. Lam employees compiled and revised the lists of parts for Exhibit A. Lam's lawyers drafted and modified the actual language of the agreement and no lawyer reviewed it on behalf of Aspect. The jury therefore might reasonably have construed the contract's ambiguity against Lam. Regardless, ample evidence was presented for the jury to have concluded that Aspect's interpretation was the more accurate. Lam's motion for judgment as a matter of law on liability for breach of the 2002 agreement will therefore be denied.

With respect to liability under the 2004 agreement, Aspect produced evidence of test fixtures for the AutoEtch and DryTek tools that Lam withheld at the instruction of Mr. Charrette. Lam argues that the only evidence before the jury was that those test fixtures were obsolete and therefore Lam was not obligated to provide them to Aspect under the terms of the 2004 agreement. However, Lam's own behavior casts doubt upon

1  its restrictive view of the fixtures to be transferred under the 2004 agreement. Shortly
2  after the agreement was signed, Lam's negotiator, Mr. Theess, instructed his employees
3  to identify the test fixtures that should be transferred to Aspect. (Tr. Ex. 58.) The list that
4  they created is probative evidence of the fixtures that should have been transferred
5  according to the terms of the agreement. Furthermore, the jury did not have to believe
6  Lam's trial witness, Mr. Thorn, regarding the obsolescence of the fixtures on that list. It
7  was entitled to evaluate his credibility in light of all the evidence, including his own
8  participation in the list's creation. Lam's motion for judgment as a matter of law on
9  liability for breach of the 2004 agreement will therefore be denied.

**B. Damages**

11  Lam argued in its pre-verdict motions, and reasserts now, that Aspect failed to
12  prove that any of the alleged breaches of contract caused Aspect to lose profits. For
13  example, Lam asserts that Aspect never showed that its inability to access any particular
14  drawing or test fixture prevented it from filling any particular order. There was, however,
15  testimony that drawings, specifications, and test fixtures are generally necessary for a
16  company to be able to support the DryTek and AutoEtch machines. Aspect's witnesses
17  testified that such materials were essential for them to support DryTek and certain
18  versions of AutoEtch machines, with which they had no previous experience. They
19  testified that they were never able to support those machines because Lam withheld the
20  necessary materials. There was also testimonial and documentary evidence that Lam's
21  provision of primarily obsolete parts imposed extra inventory costs on Aspect and
22  seriously impaired their cash flow, contributing to the business's failure. Furthermore, it
23  is obvious that illegitimately removing parts from the list that was to become Exhibit A
24  would cause Aspect to lose any profit associated with those parts. There was therefore
25  evidence in the record for the jury to find a causal connection between each of Lam's
26  breaches and a loss of profit for Aspect.
27  Lam is incorrect that the jury's damages award is infected by evidence of its other
28  misconduct presented at trial. The breaches just discussed fall within the outlined claims

1 remaining for trial. At Lam's request, the jury was instructed that it could award to
2 Aspect only those damages that arose from the specified breaches. The instructions
3 therefore ensured that the jury did not award damages for any of Lam's other misconduct
4 that may have been mentioned at trial. Furthermore, Lam did not raise this specific
5 argument in its pre-verdict motions. In those motions, Lam argued that Aspect had not
6 shown that any one of the specified partial breaches actually caused it to lose its profit on
7 the deal. It did not argue that other factors contributed to Aspect's lost profits and had not
8 been accounted for, nor did it identify any such factor that appeared in the record.
9 Therefore, even if such arguments were meritorious, Lam could not rely on them in its
10 renewed motion.

11 Lam did previously argue, and reasserts now, that Aspect failed to prove with
12 reasonable certainty the amount of profit that Lam's breaches caused it to lose. At trial,
13 Aspect's CEO, Mr. Key, testified that Lam's breaches caused it to lose the profits it
14 would have earned on $4.5 million of revenue per year. At the outset of negotiations,
15 Lam's negotiator, Mr. Charrette, represented that Lam had earned approximately $4.5
16 million in revenue from its AutoEtch and DryTek business. However, at the time that the
17 parties signed the 2002 agreement, Aspect knew that the $4.5 million estimate was
18 incorrect and that Lam's actual revenue from AutoEtch and DryTek was less than that
19 figure. The Court therefore struck Mr. Key's testimony concerning the profit that Aspect
20 had lost. Nevertheless, there was other evidence in the record that showed with
21 reasonable certainty the amount of revenue that Aspect lost due to Lam's breaches.

22 For example, under Aspect's interpretation, Lam breached the 2002 agreement by
23 withholding information on parts necessary to successfully take over Lam's DryTek
24 business. The DryTek spare parts and refurbishment business was already established at
25 Lam and Aspect had considerable experience in a related line of business. Lost profits
26 from an established business "are generally recoverable for the reason that their
27 occurrence and extent may be ascertained with reasonable certainty from the past volume
28 of business and other provable data relevant to the probable future sales." *Kids' Universe*

1  *v. In2Labs*, 95 Cal. App. 4th 870, 883, 116 Cal. Rptr. 2d 158, 168 (2002) (quoting *Grupe*
2  *v. Glick*, 26 Cal. 2d 680, 692, 160 P.2d 832, 840 (1945)).  The record contained historical
3  revenue figures associated with Lam's DryTek business.  (*See, e.g.*, Trial Ex. 1.)
4  Therefore, the jury had evidence showing the amount of revenue that Aspect lost when
5  Lam illegitimately withheld information necessary to support DryTek machines.

6        Lam complains that the revenue figures in the record are inaccurate because they
7  include revenue from "common parts," which may have been sold for use in systems
8  other than DryTek.  However, a plaintiff seeking lost profits is "not required to establish
9  the amount of its damages with absolute precision," bur rather is required to prove their
10 occurrence and extent only with reasonable certainty.  *Kids' Universe*, 95 Cal. App. 4th at
11 884, 116 Cal. Rptr. 2d at 168 (quoting *S.C. Anderson, Inc. v. Bank of America* 24 Cal.
12 App. 4th 529, 537, 30 Cal. Rptr. 2d 286, 290 (1994)).  "The law only requires that the
13 best evidence be adduced of which the nature of the case is capable."  *Stott v. Johnston*,
14 36 Cal. 2d 864, 876, 229 P.2d 348, 355 (1951).

15       The definition and status of "common parts" were two of the most important issues
16 that the jury had to resolve in light of the negotiating history of the 2002 agreement.
17 There was confusion among both Aspect and Lam employees about which parts were
18 "common parts" and what status such parts had under the 2002 agreement.  For example,
19 Aspect presented evidence that some of Lam's own employees believed that at least some
20 of the "common parts" that Lam removed after signing the 2002 agreement were actually
21 AutoEtch and DryTek parts that should have been transferred to Aspect.  Given the
22 confusion regarding "common parts," the contemporaneous documentary evidence did
23 not differentiate between the revenue that Lam earned on such parts for AutoEtch and
24 DryTek machines versus other types of machines.

25       Consequently, the best evidence that Aspect was capable of producing concerning
26 historical revenues from DryTek were Lam's own figures, which it had provided during
27 negotiations and which its own internal e-mails confirmed.  Lam cannot pin the supposed
28 inaccuracy of those figures on Aspect.  Lam is responsible for any such inaccuracy and

1  the unavailability of more precise figures.  "A wrongdoer cannot complain if his or her
2  conduct 'creates a situation in which the court must estimate rather than compute
3  [damages].'"  *Elec. Funds Solutions, LLC v. Murphy*, 134 Cal. App. 4th 1161, 1181, 36
4  Cal. Rptr. 3d 663, 677 (quoting *Sanchez-Corea v. Bank of America,* 38 Cal.3d 892, 908,
5  215 Cal. Rptr. 679, 690 (1985)); *see also Stott v. Johnston*, 36 Cal. 2d at 876, 229 P.2d at
6  355 ("[T]he defendant whose wrongful act gave rise to the injury will not be heard to
7  complain that the amount thereof cannot be determined with mathematical precision.");
8  *Zinn v. Ex-Cell-O Corp.*, 24 Cal. 2d 290, 297–98, 149 P.2d 177, 181 (1944) ("One whose
9  wrongful conduct has rendered difficult the ascertainment of the damages cannot escape
10  liability because the damages could not be measured with exactness."); *Kids Universe,*
11  95 Cal. App. 4th at 884, 116 Cal. Rptr. 2d at 168–69.  The evidence in the record allowed
12  the jury to estimate the amount of profits that Aspect lost on the DryTek business with
13  reasonable certainty, taking into account that some of the figures may have included
14  revenue from other systems.

15  Lam now contends that it produced spreadsheets showing a four-year history of its
16  DryTek sales in response to Aspect's requests for production.  Since Aspect did not
17  designate those spreadsheets as evidence at trial, Lam argues that it failed to put forth the
18  best evidence it was capable of producing to prove its lost profits.  Lam made no such
19  argument in its pre-verdict motions, either in its written submissions or by oral motion
20  before the Court.  It argued that Aspect's $4.5 million revenue figure was inaccurate and
21  that Aspect had not produced evidence of the revenue that it would have earned but for
22  Lam's breaches.  It did not argue that Aspect had failed to produce the best evidence
23  available to it, nor did ever suggest the nature or content of that supposed best evidence.
24  To allow Lam to rely on this argument now would run directly contrary to the central
25  reason for prohibiting new arguments in renewed post-trial motions.  Requiring all
26  grounds for the motion to be presented before the jury returns a verdict "calls to the
27  court's and the parties' attention any alleged deficiencies in the evidence at a time when
28  the opposing party still has an opportunity to correct them."  *Freund*, 347 F.3d at 761.

1  Lam did not raise this specific argument in its pre-verdict motions. It deprived Aspect of
2  the opportunity to offer the evidence Lam claims was available. Lam therefore cannot
3  rely on this argument to overturn the jury's verdict.

4  Moving beyond the certainty of proof regarding lost revenue from DryTek, there
5  was also reasonably certain evidence that Aspect lost revenue from parts that Lam
6  removed from Exhibit A after the 2002 agreement was signed. Several of Lam's own
7  internal e-mails confirmed that some of the parts that it had removed should have been
8  transferred to Aspect and had generated approximately $500,000 in annual revenue for
9  Lam. Other e-mails suggested that the revenue associated with parts removed from the
10 list was in the millions of dollars. Under the circumstances of this case, the evidence in
11 the record permitted the jury to determine the amount of revenue that Aspect lost from
12 Lam's breach with as much certainty as can be reasonably expected.

13 The record also contained reasonably certain evidence of the gross margins that
14 Aspect could expect from the agreements. The jury heard testimony from more than one
15 witness that Aspect and Lam's historical gross margins on the AutoEtch and DryTek
16 parts business were in the 40% to 50% range. Documents admitted into evidence confirm
17 those figures. There was also reasonably certain evidence that the AutoEtch and DryTek
18 business was going to continue for a number of years. Aspect's own projections in 2003
19 showed that it expected the business to last at least through 2008. In 2006, after Lam
20 ceased its relationship with Aspect, it signed a five-year contract with Air Products for the
21 AutoEtch and DryTek lines, reconfirming the viability of the business for several more
22 years. Using all of this evidence, the jury could calculate the amount of profit that Aspect
23 lost from Lam's breaches with reasonable certainty.

24 Lam argued in its pre-verdict motions, and reasserts now, that the jury returned a
25 gross profits damages award. "A plaintiff must show loss of net pecuniary gain, not just
26 loss of gross revenue." *Kids' Universe*, 95 Cal. App. 4th at 884, 116 Cal. Rptr. 2d at 169.
27 Lam argues that the jury could not determine Aspect's net lost profits because the record
28 did not contain information on the amount of profit that Aspect actually made on the deal.

However, there was testimony at trial and documentary evidence in the record that showed the amount of revenue that Aspect generated from the agreements. Mr. Mazzulla testified that, at best, Aspect earned about $200,000 per month. Documentary evidence in the record is consistent with that estimate. Mr. Key also testified consistent with that estimate that Aspect made about $3 million in revenue from the Lam deal in 2003. He estimated that the revenue fell to $2.8 million in 2004 and $1.7 million in 2005. In 2006, Lam nullified any further benefits of the agreements by severing its relationship with Aspect and contracting with Air Products to support the AutoEtch and DryTek systems.

The jury also knew the total amount that Aspect had paid to Lam under the agreements. It heard testimonial evidence on the amount that Aspect had paid. It also was able to independently calculate that amount from the parties' stipulations and the terms of the 2002 agreement. The jury was therefore able to arrive at a reasonably certain estimate of Aspect's actual profits, if any, by subtracting the amount that Aspect actually paid to Lam from the gross profit that Aspect earned. The jury was instructed to subtract Aspect's actual profits from any damages that it awarded to Aspect. Therefore, Lam is incorrect that the jury must have returned a gross profits award. It had everything it needed to produce a reasonably certain net lost profits damages award. Lam's motion for judgment as a matter of law on damages will therefore be denied.

### III. New Trial

Lam moves for a new trial. A court may grant a new trial after a jury trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a)(1)(A). "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). In considering a motion for new trial, the court must adhere to the harmless error rule of Fed. R. Civ. P. 61, which "provides that no error in any ruling or order by the court is ground for a new

1 trial or otherwise disturbing a judgment unless refusal to do so is inconsistent with
2 substantial justice." *Bunch v. United States*, 680 F.2d 1271, 1283 (9th Cir. 1982).

3       In its motion for a new trial, Lam repeats many of the arguments that it made in its
4 renewed motion for judgment as a matter of law. Those arguments are rejected for the
5 same reasons as explained above. The jury's verdict was not against the weight of the
6 evidence. There was ample evidence for the jury to conclude that Lam committed the
7 specified breaches and to determine Aspect's lost profits with reasonable certainty. The
8 jury was not allowed unfettered discretion in interpreting the agreements. The Court
9 determined that Aspect had presented a plausible interpretation of the agreements in light
10 of the context and circumstances. The jury was given standard California jury
11 instructions on contract interpretation. It was specifically instructed that it could not
12 award damages for any breach other than those specified in the instructions.

13       Lam's main contention on its motion for a new trial is that Aspect did not disclose
14 its damages calculation in accordance with Rule 26(a)(1)(A)(iii). The Court addressed
15 that issue in its order denying Lam's motion in limine. (Doc. # 126.) Aspect did disclose
16 a lost profits damages calculation and supporting evidence in its Mediation
17 Memorandum. Contrary to Lam's assertion, Aspect did not limit that damages
18 calculation to its fraud claim. Lam participated in extensive discovery after that
19 disclosure, including by taking the depositions of Mr. Key and Mr. Mazzulla, whom
20 Aspect had designated as fact witnesses on the issue of damages. Aspect further relied on
21 its lost profits calculation in its motion for summary judgment. Aspect therefore fairly
22 notified Lam of its lost profits damages calculation.

23       In denying Lam's motion in limine, the Court noted that "Aspect continues to rely
24 exclusively on that calculation and evidence," referring to the lost profits calculation that
25 Aspect had disclosed. (Doc. # 126 at 3.) Lam attempts to convert that observation into a
26 ruling that Aspect would be strictly limited to offering the specific damages figures that it
27 had disclosed. For example, according to Lam, the Court ruled that since Aspect
28 disclosed that Lam's breach had caused it to lose $4.5 million in revenue per year, the

1  jury could consider no other revenue figure that might appear in the record. Lam argues
2  that it relied on that ruling to prepare its trial strategy and present its evidence. It
3  therefore asserts that it was unfairly prejudiced by the Court's decision on the fifth day of
4  trial to change its ruling and allow Aspect to submit an "anything goes" damages claim to
5  the jury.

6  Lam grossly mischaracterizes both the Court's original ruling on its motion in
7  limine and its subsequent ruling on the fifth day of trial. At no point did the Court rule
8  that Aspect would be limited to the specific damages figures that appeared in its original
9  disclosure. The Court simply denied Lam's motion in limine because Aspect had
10 sufficiently disclosed its lost profits calculation. Lam points out that subsequently, during
11 oral argument at the pretrial conference and on Lam's pre-verdict Rule 50(a) motion, the
12 Court pressed Aspect about the unfairness of allowing it to substantially depart from the
13 disclosed damages calculation. The Court was not ruling on the issue at that time. The
14 Court's ruling came with its denial of Lam's pre-verdict Rule 50(a) motion on the fifth
15 day of trial. Contrary to Lam's assertion, Aspect was not allowed to proceed on an
16 "anything goes" damages claim. Rather, the Court carefully restricted Aspect to
17 proceeding with the general structure and methodology of its disclosed lost profits
18 calculation. The Court found no prejudice in allowing the jury to consider the evidence
19 presented at trial to arrive at specific figures for revenue, gross margin, business duration,
20 and total lost profits. (Trial Tr. at 905–06; 913.) During closing arguments, Aspect was
21 not allowed to depart from the basic lost profits theory that it had disclosed. The jury
22 instructions ensured that any damages award would also conform to that methodology.
23 As already discussed, the record contained sufficient evidence for the jury to determine
24 with reasonable certainty the amount of profit that Aspect lost according to the disclosed
25 methodology.

26 Lam argues that the lost profits calculation that Aspect disclosed did not account
27 for any profit that Aspect actually earned from the agreements, so Lam was unduly
28 prejudiced by the presentation of any figures on that issue. The reason that Aspect's

- 14 -

calculation did not subtract out actual profits resulting from the deal was because Aspect asserted that it had earned no such profit. Aspect had taken that position from the outset of the case. Lam's motion in limine, its pre-verdict Rule 50(a) motions, and its closing arguments show that it understood the evidence in the record regarding Aspect's actual revenues and was prepared to dispute Aspect's contention that it earned no profit. There was no prejudice to Lam in allowing the jury to hear the arguments of both sides and make a determination on that issue.

Lam further complains that Aspect's CEO, Mr. Key, was allowed to testify to undisclosed figures concerning the amount of revenue that Aspect earned from the agreements in 2003, 2004, and 2005. However, Aspect designated Mr. Key as a fact witness with information concerning damages. Lam deposed Mr. Key on that subject. Nothing prevented Lam from asking Mr. Key how much revenue Aspect earned as a result of its contracts with Lam. Moreover, even without Mr. Key's testimony the jury could have come to a reasonably certain estimate of the profit, if any, that Aspect made from the deal. Mr. Mazzulla, who had been deposed by Lam, testified about the maximum amount of monthly revenue Aspect actually earned from the 2002 agreement. Documents admitted into evidence were consistent with his testimony. Therefore, any error from admitting Mr. Key's testimony on Aspect's revenues was harmless. Similarly, Lam cannot obtain a new trial by arguing that Mr. Key was allowed to provide an undisclosed expert opinion on gross margins in the industry. Even if that were true, the record contained plenty of other evidence, both testimonial and documentary, on Aspect's and Lam's historical and expected gross margins from the AutoEtch and DryTek lines.

Lam was not prejudiced by the Court's decision to allow the jury to use the evidence presented at trial to determine the specific amount of revenue that Aspect lost, the reasonably certain duration of the business's profitability, and the total amount of Aspect's lost profits. Lam participated in extensive fact discovery after Aspect disclosed its lost profits calculation. It had copies of every document admitted into evidence and had access to depose every witness who testified. There is no indication that Aspect's

witnesses were uncooperative at their depositions. If Aspect's responses to Lam's document requests and interrogatories concerning damages were deficient, Lam could have moved to compel Aspect to comply with those requests. It did not. If Lam felt that Aspect's damages case was deficient, it could have moved for summary judgment on that basis. It did not. Lam made a tactical decision not to attack Aspect's damages case directly and instead moved to default Aspect for failure to disclose under Rule 37. Aspect's disclosure was sufficient to place Lam on notice of its lost profits calculation and methodology. Lam is not entitled to a new trial simply because its strategy did not produce the results it desired.

## IV. Motion to Amend Judgment

Lam moves to amend the judgment entered against it to account for prejudgment interest. The Court granted Lam's motion for judgment as a matter of law that the 2004 agreement resolved the purchase price for the spare parts inventory that Lam delivered to Aspect and that Aspect never returned. According to the 2004 agreement, that amount was $936,595.88. The 2004 agreement also established a payment plan for that amount. Aspect admitted that it failed to make some of those payments, which constitutes a breach of the 2004 agreement. The Court will therefore amend the judgment to reflect that Lam prevailed on its counterclaim for the purchase price of the inventory actually provided to Aspect, as defined by paragraph 4 of the 2004 agreement.

Aspect has given no reason that Lam should not receive interest on any past-due payments under that plan up to the time of judgment. Aspect's argument that Lam's prior material breach excused Aspect's obligation to perform is incorrect. Aspect reaffirmed its obligation to pay the amount stated in the 2004 agreement by signing the agreement with full knowledge of Lam's breaches under the 2002 agreement. Furthermore, at trial, Aspect withdrew its request for a jury instruction on excuse of performance from prior material breach. Aspect also argues that some payments to Lam are not yet due, but were included in the jury's damages calculation without having been discounted to present value. It therefore asserts that any prejudgment interest awarded to Lam should be offset

by an increase in the damages award to account for the present value of future payments not yet due. The time for Aspect to argue about the form of the jury's damages calculation has long since passed. Aspect made no objection to including future payments in the damages calculation when formulating the jury instructions. It cannot raise the issue now.

Lam's motion to correct the judgment is inaccurate to the extent that it implies that the parties stipulated to the amount of interest due. Rather, the parties stipulated to allow the Court to make any findings of fact necessary to compute the interest due to Lam. Lam has supplied figures that appear to include past-due royalty payments. Lam did not receive judgment as a matter of law that it was owed any royalty payments. It was granted judgment as a matter of law only as to its counterclaim for the purchase price of the inventory provided to Aspect, as defined by the 2004 agreement. To be clear, Lam is only entitled to prejudgment interest on payments Aspect failed to make towards the agreed amount of $936,595.88 according to the payment plan established in the 2004 agreement up to the time of judgment. The federal judgment interest rate as provided in 28 U.S.C. § 1961 is the applicable rate. (*See* doc. # 211.) The parties will therefore be ordered to confer on the amount of interest that is due to Lam. If the parties cannot agree, they are instructed to submit evidence of the amount of interest owed and the Court will make the necessary findings of fact. The amount determined will be subtracted from the net lost-profits award returned by the jury.

**V. Attorney's Fees**

Aspect argues that it may be awarded its attorneys fees under A.R.S. § 12-341.01. Section 16 of the 2002 agreement states as follows:

> 16) <u>Governing Law</u>. This contract has been negotiated under and shall be construed in accordance with the laws of the State of California without regard to its conflict of laws provisions.

As dictated by this paragraph, California law governs the interpretation of this choice of law provision. *Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459, 469 n.7, 11 Cal. Rptr. 2d 330, 336 n.7, 834 P.2d 1148, 1154 n.7 (1992) (noting that a choice of law clause

- 17 -

applies in interpreting clause itself).

The Supreme Court of California has held that "a valid choice-of-law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses all causes of action arising from or related to that agreement." *Id.* at 470, 11 Cal. Rptr. 2d at 337, 834 P.2d at 1155. The court was extremely skeptical that "any rational businessperson . . . would intend that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship." *Id.* at 469, 11 Cal. Rptr. 2d at 1154, 834 P.2d at 336. It stated that if such a result was desired, the parties should "negotiate and obtain the assent of their fellow parties to explicit contract language specifying what jurisdiction's law applies to what issues." *Id.* at 470, 11 Cal. Rptr. 2d at 1154, 834 P.2d at 336.

The heading of the choice of law provision in the 2002 agreement makes clear that California law is the "governing law" of the agreement. It is true that the body of the paragraph does not clearly state that California law governs the agreement in general. However, in light of the holding in *Nedlloyd Lines*, the use of such language in the heading sufficiently indicates that the parties intended California law to apply to all issues arising from the agreement. Therefore, Aspect may not be awarded attorney's fees under Arizona law.

Alternatively, even if A.R.S. § 12-341.01 did apply, the award of attorneys fees under that statute is discretionary. *Associated Indem. Corp. v. Warner*, 143 Ariz. 567, 570, 694 P.2d 1181, 1184 (1985). After considering the factors mentioned in *Warner*, the Court in its discretion would not award attorneys fees in this case. This is an alternative ruling, so it is not necessary to address those factors in detail at this time.

**VI. Bond on Appeal**

An appellant may obtain stay of judgment by posting a supersedeas bond at or after the time of filing the notice of appeal. Fed. R. Civ. P. 62(d). In lieu of a conventional supersedeas bond, Lam proposes to provide Aspect with one or more "evergreen" stand-by letters of credit drawn in favor of Aspect and deposited with the

Court, payable by presentation of an order of the Court. The issuing banks would be either or both of Union Bank of California or Royal Bank of Scotland. As neither of these banks reside in Arizona, Lam's proposal would force Aspect to proceed in a foreign jurisdiction to collect the bond. The added complexity of collecting the bond and Aspect's concerns regarding the financial stability of the institutions are sufficient reasons to deny Lam's proposed form of security. *Dillon v. City of Chicago*, 866 F.2d 902, 904–05 (7th Cir. 1988) (noting that "the complexity of the collection process" and "the degree of confidence that the district court has in the availability of funds to pay the judgment" are appropriate considerations). Therefore, Lam's motion will be denied.

Nevertheless, Lam is correct that it is possible to devise an alternate form of credit that protects Aspect from the risk of a later uncollectible judgment and compensates Aspect for any loss resulting from the stay of execution. *See Int'l Telemeter v. Hamlin Int'l Co.*, 754 F.2d 1492, 1495 (9th Cir. 1985) (permitting security other than a bond). It is in both parties' interests to minimize the cost of such security. *See* Fed. R. App. P. 39(e) (including "premiums paid for a supersedeas bond or other bond to preserve rights pending appeal" in costs taxable against the losing party on appeal). Any cash equivalent would likely be a satisfactory supersedeas.

IT IS THEREFORE ORDERED that Defendant Lam Research Corporation's renewed motion for judgment as a matter of law (doc. #218) and its motion for a new trial (doc. # 219) are denied.

IT IS FURTHER ORDERED that Lam's motion to amend the clerk's judgment (doc. # 212) is granted in part. The Court's judgment (doc. # 211) will be amended to reflect that Lam prevailed on its counterclaim for the purchase price of the inventory actually provided to Aspect, as defined by paragraph 4 of the 2004 agreement. The parties shall confer on the amount of interest that is due to Lam for past-due payments under the plan established in the 2004 agreement up to the time of judgment. Submission of an agreed amount or the parties' respective evidence on that amount are due by June 5, 2009.

1     IT IS FURTHER ORDERED that Aspect's motion for attorney's fees (doc. # 217) is denied.

IT IS FURTHER ORDERED that Lam's provisional motion pursuant to Rule 62(d) for approval of bond on appeal (doc. # 239) is denied.

DATED this 14th day of May, 2009.

                                            Neil V. Wake
                                    United States District Judge